IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ABDOU BADIANE

*Plaintiff,*

-- against --

JPMORGAN CHASE BANK, N.A.

*Defendants.*

Civil Action No. 1:20-cv-2054

**COMPLAINT AND JURY
DEMAND**

Plaintiff Abdou Badiane hereby alleges, upon personal knowledge as to himself and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.    Two months after Plaintiff Abdou Badiane, then an eighteen year old high school senior, opened a college account at Defendant JPMorgan Chase Bank to save money for college, more than 120 fraudulent transactions occurred on the account in the space of a few weeks. Plaintiff promptly disputed the unauthorized charges, Defendant, however, found them valid, despite clear indications of fraud and the fact that Defendant itself had identified the transactions as suspicious prior to Plaintiff's dispute. As a result of the fraud, Plaintiff lost the $1500 he was saving for college. Defendant is now holding Defendant liable for over $6000 worth of fraudulent transactions and has filed an adverse report against him with a credit reporting agency.

2.     Plaintiff brings the instant action against Defendant for its failure to comply with the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., its implementing rules and regulations; New York General Business Law § 349; and state common law.  Plaintiff seeks damages, along with injunctive relief, reasonable costs, and attorney's fees.

1

## JURISDICTION AND VENUE

3.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant JPMorgan Chase Bank does business in this district, in part through its branch located at 55 W. 125th St, New York, New York, 10027.

4.      Venue in this district is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

5.      Plaintiff Abdou Badiane is a 19-year-old African-American college student who resides in New York County.

6.      Plaintiff is a consumer as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(6), because he is a natural person, had an account held by a financial institution, was issued an access device by that financial institution, and entered into an agreement with that financial institution for the provision of electronic fund transfer services.

7.      Defendant JPMorgan Chase Bank, NA is a national banking association whose principal place of business is located in Columbus, OH.

8.      Defendant is a financial institution as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(9), because it is a national bank that directly or indirectly holds accounts belonging to consumers, issued Plaintiff with an access device and entered into an agreement with him to provide electronic fund transfer services.

## FACTUAL ALLEGATIONS

### Plaintiff's Chase Bank Account History

9.      Plaintiff Abdou Badiane ("Mr. Badiane") is a nineteen year old college student who lives with his parents in Harlem, a neighborhood in upper Manhattan.

10.    Mr. Badiane comes from a low-income household and worked very hard when he was a high school student to save up $1500 for college.

11.    In January 2019, when Mr. Badiane was a high school senior, he opened a checking account with JPMorgan Chase Bank, N.A. (hereinafter "Chase") and deposited the $1500 which he was saving for college into it. Mr. Badiane's account remained open and active until Chase closed the account in, or about, June 2019.

12.    Upon information and belief, Mr. Badiane signed a standard deposit account agreement with Chase.

13.    The Chase account was Mr. Badiane's first bank account.

14.    Mr. Badiane signed up for the Chase mobile banking app, but did not familiarize himself with it or use it, because he did not intend to make any deposits or withdrawals. Mr. Badiane downloaded the app to his phone and set up the app to open with a password rather than a fingerprint.

15.    Shortly after he opened the account, Mr. Badiane received a Chase secured bank card in the mail. Mr. Badiane noticed the card had a crease in it, as if it had been bent, but he had never had a bank account or debit card before, so he did not realize this was unusual. Mr. Badiane activated the card by phone, but did not change the default Personal Identification Number (hereinafter "PIN").

16.    Mr. Badiane stored his PIN in his phone using a function that allowed him to save notes in his phone.

17.    He also kept other information he might need to be able to reference quickly on his phone, including his date of birth and his social security number.

18.    Mr. Badiane' s phone was password-protected and did not require a fingerprint

to access it.

19.      Because Mr. Badiane was using the Chase account to save money, he gave the

secured bank card (hereinafter "bank card") to his father for safekeeping. His father put it in a

drawer in their apartment where he kept important papers.

20.      Upon information and belief, the bank card never left Mr. Badiane's apartment.

21.      Mr. Badiane never used the bank card as a debit card or as a credit card and

never authorized anyone else to do so.

22.      On or about May 20, 2019, Mr. Badiane received a letter in the mail from

Chase saying his account had been overdrawn.  Mr. Badiane immediately worried because he

knew he had not made any withdrawals and he did not understand how there could have been

an overdraft.

23.      Prior to the overdraft notice, Mr. Badiane had not received anything in the mail

from the bank to indicate there was a problem with the account.

24.      Mr. Badiane's father, who is limited English proficient, helped him call Chase

the same day he received the overdraft notice.

25.      Together, they reported the fraud, informing Chase that all transactions on the

account after the initial deposit of $1500 were unauthorized.

26.      Because they had difficulty communicating with the bank, they went in person

the next day to their local Chase branch.

27.      In the presence of Mr. Badiane and his father, the branch representative

contacted the Chase fraud department to inform it of the unauthorized transactions.

28.      Because they were confused about the process and wanted to make sure they

had done everything right, Mr. Badiane and his father visited the branch several  more times

and called Chase at least once more to make sure the fraud had been reported correctly.

29.     Mr. Badiane informed each Chase representative he spoke to that all transactions on the account after the initial deposit were unauthorized.

30.     Upon information and belief, Chase did not mail any bank statements to Mr. Badiane prior to his report of the fraud.

31.     Chase sent Mr. Badiane two e-mails informing him that his deposit statement was available: one dated March 1, 2019, before any unauthorized charges were made, and the other dated May 28, 2019, after all the unauthorized transactions had been reported and disputed to Chase.

32.     Because he was not using the card, Mr. Badiane was not expecting any communications from Chase. He assumed the e-mails were promotional in nature and did not open them until after he reported the fraud.

33.     The first bank statement which showed fraudulent transactions covered the time period of February 28, 2019 through March 26, 2019, and upon information and belief, was generated on or about March 26, 2019.

34.     When Mr. Badiane obtained additional statements from Chase covering the periods of March 27, 2019 through April 24, 2019 and April 25, 2019 through May 24, 2019, each showed additional unauthorized transactions. The April 25, 2019 through May 24, 2019 statement was generated after Mr. Badiane reported the fraud.

35.     Mr. Badiane informed Chase of all errors on the statements within sixty days of the date of the generation of the statements on which they appeared, and within two business days of learning his bank card could have been lost or stolen through the overdraft letter Chase sent him in May 2019.

36.     Mr. Badiane did not make any of the fraudulent transactions, did not give permission to anyone else to make them, and received no benefit from the transactions.

37.     Mr. Badiane did not give his bank card or his PIN to anyone else and did not give anyone else permission to use his bank card or PIN.

38.     Upon information and belief, if anyone used Mr. Badiane's physical card, they obtained it by stealing it from the mail. Because the bank card showed signs of having been tampered with when Mr. Badiane first received it, it is likely someone intercepted his bank card in the mail and either duplicated it and/or took the chip off and replaced it, before it arrived in Mr. Badiane's mailbox.

39.     Upon information and belief, Mr. Badiane is a victim of identity theft.

40.     In an effort to get Chase to take his disputes seriously, Mr. Badiane attempted to file a police report with his local precinct, but the police refused to take it. They told Mr. Badiane they could not do so because Chase had closed its investigations.

41.     With the help of his attorney, Mr. Badiane filed an identity theft report with the Federal Trade Commission on August 15, 2019.

42.     Mr. Badiane made a second attempt to file a police report in January 2020, which, upon information and belief, was successful, although he has not yet received the report number.

***The Fraudulent Transactions***

43.     Mr. Badiane identified more than 120 unauthorized transactions on his account made between March 8, 2019 and the time the account closed in or about June 2019.

44.     The majority of these transactions were concentrated over a few days in April and include the following:

a) Thirteen individual purchases of $2.00 or less at a Stop & Shop in Brooklyn, New York, where the purchaser got $100-$200 cash back per purchase for a total of $2500.

b) At least sixty[1] transactions made using Zelle Quickpay (Chase's person to person money transfer app embedded in the Chase Mobile app): $12,450 in deposits and $741 in withdrawals.

c) ATM withdrawals of approximately $6285.00, at least $6223.50 of which were made in California.

d) California Lyft rides totaling $117.00 and $155 in Lyft card purchases, for a total of $272.00.

45.     Chase's list of the disputes are attached to the Complaint as Exhibit A.

46.     At the time the fraudulent transactions were made, Mr. Badiane lived and attended high school in Manhattan.

47.     The unauthorized withdrawals and purchases all took place outside of Mr. Badiane's Harlem neighborhood, most of them in Brooklyn or California, with a few in Queens and one in midtown Manhattan.

48.     Mr. Badiane has never been to California, and has only been in Queens and Brooklyn a few times in his life.

49.     Mr. Badiane was not in Brooklyn or Queens on the dates when the fraudulent transactions occurred there.

50.     The only transaction which occurred in Manhattan was a withdrawal at an ATM approximately forty minutes from Mr. Badiane's home by subway.

---

[1] Although Plaintiff requested copies of all his statements from Defendant, Defendant has yet to provide them. These figures are based on the incomplete statements in Plaintiff's possession at the time of filing.

51.     Mr. Badiane did not make this withdrawal; he had no reason to go so far to use an ATM, since there is Chase ATM that is a five minute walk away from his residence.

***Chase's Investigation***

52.     Chase assigned dates of inquiry to each dispute which, upon information and belief, are the start date of the investigations rather than the reporting date; the inquiry dates are in June 2019, but upon information and belief, the disputes were initially reported in May 2019.

53.     Although Chase sent Mr. Badiane notices that it was provisionally crediting the disputed charges back to his account, Mr. Badiane never had access to his funds.

54.     Chase returned the disputed charges to Mr. Badiane by check, but only after because Chase had closed Mr. Badiane's account, so he was unable to deposit it. When Mr. Badiane endorsed the check to be deposited in his mother's bank account, the checks did not clear.

55.     Upon information and belief, when Mr. Badiane brought this to the attention of a Chase branch employee, he was told that they would not honor the check.

56.     Upon information and belief, Chase repeatedly exceeded the time frames permitted by statute to credit back the charges and to conduct its investigation of the disputes.

57.     Chase ultimately denied six out of the seven disputes made by Mr. Badiane: two on the same day the inquiries opened, three within two to four business days of opening, and one after twelve business days.

58.     The only dispute Chase found valid was the dispute involving Lyft rides in California, which it approved after sixty-eight days, more than thirteen days longer the time allowed by statute for the investigation of Point of Service charges (charges made using a

bank card to purchase goods or services).

59.     Chase found all the other California charges totaling approximately $2600, authorized, despite the fact that they took place in the same geographic location and time frame as the charges it found unauthorized.

60.     Chase's denials consisted of boiler plate letters labeled "Update: We completed our research of your claim."

61.     Chase gave no information regarding the investigation other than to state that each disputed transaction was "processed correctly or was authorized" and instructed Mr. Badiane to contact Chase to request the information "used for our research."

### *Plaintiff's Requests for Information*

62.     On August 16, 2019, Mr. Badiane's attorney sent a letter to Chase asking it to provide Mr. Badiane with all the records Chase relied upon in its investigation and the reasons for its findings. The attorney attached a copy of Mr. Badiane's identity theft report to the letter.

63.     Chase acknowledged receipt of the letter through a voicemail left for Mr. Badiane's attorney on September 12, 2019.

64.     A few weeks later, instead of providing Mr. Badiane with the requested information, Chase sent Mr. Badiane a letter stating he owed them $8050 and that his account was being put in collections.

65.     On September 30, 2019, Plaintiff filed complaints with the Consumer Financial Protection Bureau (hereinafter "CFPB") and the Office of the Comptroller of Currency (hereinafter "OCC") about Chase's denial of his disputes and its failure to respond to his letter requesting information.

66.     On October 7 2019, almost two months after Mr. Badiane' s request for information, a Chase representative left a voicemail message for Mr. Badiane's attorney stating Chase had issued a decision on his complaint and it had been mailed out.

67.     On October 10, 2019, Mr. Badiane's attorney received a letter from Chase dated September 27, 2019.

68.     The letter did not provide copies of any records other than a list of the disputed transactions which generally did not include the location or time of the transaction.

69.     Instead of providing the factual or evidentiary basis for its determination, Chase explained its decisions to deny the disputes with conclusory statements, some of which contradicted its prior communications with Plaintiff, or which were inconsistent with the known and undisputed facts.

70.     Plaintiff's attorney sent Chase a follow up letter on January 13, 2020, providing additional information to dispute the charges, and making a second demand for all records reviewed by Chase in making its determination on the disputes.

71.     When Chase failed to respond, Defendant's attorney sent Chase a second follow up letter on February 7, 2020, asking Chase again to provide the documentation as required by the EFTA.

72.     On February 24, 2020, Plaintiff's counsel received a letter from Chase dated February 13, 2020, reiterating the same conclusory reasons it had previously given for denying the disputes without providing any of the requested information.

### *Chase's reasons for denying the disputes*

#### The Zelle Quickpay Transactions

73.     Chase denied Mr. Badiane's disputes of the Zelle QuickPay transactions

because he "provided inconsistent information and there were no signs of an account takeover."

74.     Mr. Badiane has consistently stated that all transactions on the account after his initial deposit of $1500 were unauthorized.

75.     Mr. Badiane's disputes were primarily relayed to Chase's fraud department by branch representatives, and any inconsistency, upon information and belief, would be due to Chase's own errors in recording the disputes.

76.     To date Chase has failed to identify any inconsistencies in Mr. Badiane's statements, although Mr. Badiane repeatedly requested it do so.

77.     Upon information and belief, contrary to Chase's assertions, there were numerous signs that Mr. Badiane's account had been taken over.

78.     In an e-mail Chase sent to Mr. Badiane dated April 18, 2019, Chase itself flagged some of the transactions Mr. Badiane later disputed as suspicious. Unfortunately, Mr. Badiane did not see this e-mail until after he reported the fraudulent activity to Chase in May 2019.

79.     On May 2, 2019, Chase sent Mr. Badiane an update on a "claim," which stated his account had been credited $800.00. Mr. Badiane, however, had not made any claim because he had not yet learned of the fraudulent charges. Upon information and belief, the person who took over Mr. Badiane' s account made the claim. Mr. Badiane only saw this e-mail after he filed disputes with Chase.

80.     On May 10, 2019, Chase notified Mr. Badiane by e-mail that another customer had accessed his account and changed the account profile so that he would no longer receive notifications. Mr. Badiane did not give anyone else access to his account or change his

account notification settings.[2]

81.    Mr. Badiane's checking account went from having no recorded activity for months to having 120 transactions over the course of a few days.

82.    In addition, according to Mr. Badiane's bank statements, Chase reversed several Zelle Quickpay deposits made to the account because they had been disputed by the customer who allegedly made the deposit.

83.    Upon information and belief, these are all signs of an account takeover.

**The ATM withdrawals and Point of Service transactions**

84.    Chase denied disputes of withdrawals made in Brooklyn, Queens, and even in California because Mr. Badiane's "chip enabled debit card and PIN were used to process the transaction."

85.    Upon information and belief, fraud involving chip enabled cards can and does occur.

86.    The fraud may occur as the result of the card being stolen; when data from a card is stolen; when a store or ATM does not have the technology to process a chip enabled transaction and therefore requires the customer to swipe the card, using the magnetic strip; or by the use of sophisticated technology which allows an identity theft to create a new card, similar to the way magnetic strip cards were previously duplicated.

87.    For twelve of the disputed transactions, Chase denied the disputes the same day as the inquiry date.

---

[2] Mr. Badiane had downloaded the Chase mobile app to his phone, which could have been used to make the changes. Although Mr. Badiane did not give anyone access to his phone, he did inadvertently leave it behind in a park for a period of one hour.  Mr. Badiane had entered his PIN number, password and other confidential information such as his social security number into his phone to have it available for easy reference. Mr. Badiane did not set up the Chase app to require a fingerprint. It could be opened using the password and Mr. Badiane, an eighteen year old at the time, had chosen a password that would be easy to guess.

88.     Upon information and belief, Chase conducted no investigation on these transactions to rule out theft, tampering, or replacement of the original debit card with a copy.

89.     The simplest way to determine whether or not Mr. Badiane was the one who used the card would be to review CCTV recordings from the stores where they were used, or digital footage from the ATM's, but there is no indication Chase ever reviewed them.

90.     If Chase did review such footage, it has not provided those records to Mr. Badiane, although he requested them multiple times.

91.     Upon information and belief, Chase used a definition of geographic area which was inconsistent with the travel patterns of a low-income high school student dependent on public transportation.

92.     Chase found transactions that took place in Brooklyn within Mr. Badiane's geographic area, although the locations were more than an hour and a half away from Mr. Badiane's home by subway.

93.     In addition, to the extent that Chase relied on the geographic area of the transaction to find it authorized, its reliance was inconsistent: it found at least twenty transactions in California invalid, but found at least eight others valid.

94.     None of the disputed transactions are consistent with Mr. Badiane's habits.

95.     After the initial deposit in January 2019, there was no activity on the account until March 2019.

96.     In March, two small withdrawals were made using Zelle Quickpay, which Mr. Badiane had never used previously.

97.     In April, the account showed more than one hundred transactions involving Zelle Quickpay, as well as ATM and POS charges, each transaction a complete departure from

the previous pattern of activity.

98.     As previously mentioned, a number of the disputed transactions Chase found to be valid were made in California, which was completely inconsistent with Mr. Badiane's habits and certainly outside his geographic area.

### *Chase's Collection Activity*

99.     Chase informed Mr. Badiane by letter dated October 14, 2019 that he owes them a balance of $8050.00 due to the fraudulent charges and has demanded that he pay that amount.

100.    In that same letter, Chase indicated that it reported the balance to Early Warning Services (hereinafter "EWS") and that even though Mr. Badiane had disputed the charges, Chase would not correct the information.

101.    EWS is a credit reporting agency founded by several large banks, including Chase, which share information on their customers' account histories with EWS which EWS then uses to create a credit report.

102.    Chase's letter specifically references complaints that Mr. Badiane made to the Consumer Financial Protection Bureau (hereinafter "CFPB") and the Office of the Comptroller of Currency (hereinafter "OCC").

103.    Upon information and belief, Chase made the report to EWS and the demand for payment in retaliation for Mr. Badiane exercising his rights under the EFTA and filing complaints with the OCC and CFPB.

### *Mr. Badiane's Damages*

104.    Mr. Badiane did not authorize, consent to, participate in, or benefit in any way from this fraud, which resulted in his losing $1500 of his own money, a large sum for a teenager

who comes from a low- income family.

105.    The loss of his $1500 meant that Mr. Badiane did not have it available to pay his expenses at college and had to take out a loan, on which he must pay interest.

106.    In addition, Chase notified Mr. Badiane that it is holding him liable for an additional $6550 in fraudulent charges for a total of $8050, and has sent him two letters to that effect.

107.    Mr. Badiane was angry and upset at Chase's response and felt he had been falsely accused of making the fraudulent transactions.

108.    Mr. Badiane also worried when he received debt collection letters from Chase stating he owed them over $8000, an amount completely beyond his reach to obtain.

109.    When Mr. Badiane received notice that Chase submitted an adverse report to EWS), he also experienced anxiety about his financial future.

110.    An adverse report to EWS can prevent a consumer from being able to open a bank account and essentially blacklists the consumer as a high-risk customer.

111.    Mr. Badiane is studying finance at college and plans to be a stock broker or a financial analyst.

112.    Because of the negative report to EWS, Mr. Badiane's career in finance could be in jeopardy.

113.    Upon information and belief, the negative EWS report could also affect his ability to obtain student loans in future.

114.    Chase's conduct has placed a financial and psychological burden on Mr. Badiane.

115.    Chase's collection letter has also affected Mr. Badiane's relationship with his

family.

116.   When they saw the letter from Chase, his father and mother went into a panic. Mr. Badiane was saddened and upset at what his parents had to go through because of the loss of the money in his bank account.

117.   He felt that none of this was his fault, so he didn't understand why he had to go through this.

118.   Mr. Badiane has expended hours of effort attempting to mitigate the damage caused by the identity theft and Chase's failure to recognize it as such, including making repeated phone calls and visits to Chase branches, retaining an attorney, filing a police report, making an Identity Theft Report to the FTC, and applying for a student loan to replace the money he lost through the fraudulent transactions.

119.   Upon information and belief, Defendant has a pattern and practice of refusing to limit consumers' liability for fraud and representing to certain consumers, especially lower-income customers in communities of color[3], that Defendant has conducted a good-faith investigation of their fraud claims, when in fact Defendant has not.

120.   During the same time frame when Zelle Quickpay was used to make unauthorized transactions to and from Mr. Badiane's account, other instances of Zelle being used to hack into Chase customer accounts were reported.[4]

121.   The Chase mobile app, which uses Zelle Quickpay, also has a history of

---

[3] Chase has a long history of racial discrimination in terms of providing services to people of color and low income communities. *See* https://www.nytimes.com/2019/12/11/business/jpmorgan-banking-racism.html https://www.bloomberg.com/news/articles/2019-03-06/as-u-s-banks-shut-branches-jpmorgan-leads-shift-toward-wealthy https://wfpl.org/impact-of-redlining-outweighs-jpmorgans-3-million-grant-advocates-say/
[4] *See* https://www.nbcmiami.com/news/local/consumers-hit-with-fraudulent-zelle-transfers/131901/ and https://www.nbcnews.com/business/consumer/instant-fraud-consumers-see-funds-disappear-zelle-account-scam-n1015736

improperly giving consumers access to another consumer's account without authorization. [5]

122.    At least one other Chase customer had an experience similar to Mr. Badiane's where Chase denied the dispute of an unauthorized charge, even when the consumer had proof he could not have been at the geographical location where the charge was made, because Chase failed to make a proper investigation.[6]

123.    Upon information and belief, Defendant routinely finds disputed charges made by consumers to be authorized when the facts do not support that conclusion, thereby improperly shifting the burden of establishing they were unauthorized to the consumers.

## STATUTORY AND REGULATORY FRAMEWORK

### The Electronic Fund Transfer Act of 1978

124.    The primary purpose of the federal Electronic Fund Transfer Act of 1978 (EFTA), 15 U.S.C. § 1693 *et seq.*, is "the provision of individual consumer rights" by establishing the rights and responsibilities of participants in electronic fund transfer systems. 15 U.S.C. §1693(b)

125.    Regulation E (Reg. E) is the set of federal regulations created to implement the purposes of the EFTA. 12 C.F.R. § 1005 *et seq.*

126.    Under the EFTA, an "unauthorized electronic fund transfer" is "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12).

127.    The EFTA applies to "any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account."  Reg. E, 12 CFR §1005.3 (a)(1)

---

[5] https://krebsonsecurity.com/2018/02/chase-glitch-exposed-customer-accounts/
[6] https://www.mcall.com/news/watchdog/mc-chase-rite-aid-credit-card-fraud-watchdog-20170513-column.html

128.    The EFTA contains an error resolution procedure which must be followed when a consumer disputes a charge.  Under the procedure, when a consumer timely notifies the financial institution of an error, it must: conduct an investigation; determine whether an error has occurred; and report or mail the results of the investigation and the financial institution's determination to the customer within ten business days. 15 U.S.C. § 1693f(a)(3) et seq.

129.    When a financial institution credits back the disputed charge, the time for completing the investigation is extended to forty-five days if the institution provisionally credits the funds within the ten day period, advises the customer of the credit within two business days of the credit, gives the consumer full use of the funds during the investigation, corrects the error within one business day of determining an error occurred, and informs the consumer of the results of the investigation within three business days of its conclusion.  15 U.S.C. §1693f(c); 12 CFR 1005.11(c)(2)

130.    For transactions which involved a point of service purchase, the same time frame applies, except that the investigation time period of ten days when the disputes are not provisionally credited back to the account is extended to twenty business days, and the forty-five day period is extended to ninety days. 12 CFR 1005.11(c)(3)

131.    The EFTA limits the consumer's liability for unauthorized charges resulting from the loss or theft of an access device to $50 if the disputes are reported within two business days after the consumer learns the device, such as an ATM or Debit card, has been lost or stolen. 15 U.S.C. § 1693g(a)(1).

132.    The burden of proving a disputed transaction is authorized and the consumer is liable for the disputed charges rests with the financial institution, and in order to impose liability, the financial institution must have provided the consumer with the disclosures

required by the EFTA.  15 U.S.C. §1693g(b)

133.    The disclosures relevant to this instant action consist of a summary of the consumer's rights under Regulation E, including the extent of the consumer's liability for unauthorized electronic transfers and an explanation of the error resolution process.

134.    The disclosures must be made at the time an agreement for the electronic transfer service is made or prior to the consumer's first electronic transfer.

135.    Whether a consumer acted in a negligent manner which may have contributed to the occurrence of the fraudulent transaction is not a factor to be considered in imposing liability:

> [C]onsumer behavior that may constitute negligence under state law, such as writing the PIN on a debit card or a piece of paper kept with the card, does not affect the consumer's liability for unauthorized transfers.
>
> Official Interpretations of Reg. E, 12 CFR Pt. 1005, Supp. I, § 1005.6(b)-2.

136.    According to the EFTA's legislative history, the limitation on the consumer's liability for unauthorized transfers is "perhaps the most important protection contained in the entire Act."

137.    A consumer may recover actual damages, plus an additional sum in the $100-$1,000 range, the costs of the action, and reasonable attorney's fees, for a bank's violations of the EFTA. 15 U.S.C. § 1693m(a)(1)-(3).

138.    A court may award treble damages if it finds that a financial institution "did not make a good faith investigation of the alleged error," "did not have a reasonable basis for believing that the consumer's account was not in error," or "knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time

of its investigation." 15 U.S.C. § 1693f(e).

### *Office of the Comptroller of the Currency Handbook*

139.    In August 2014, the Office of the Comptroller of the Currency (OCC) issued a "Comptroller's Handbook" ("OCC Handbook") on consumer compliance and the EFTA.

140.    The OCC Handbook states, in accordance with the EFTA and Regulation E: "The extent of the consumer's liability is determined solely by the consumer's promptness in notifying the financial institution….*Other factors may not be used as a basis to hold consumers liable.*" (Emphasis added.) OCC Handbook, p. 20

141.    For unauthorized transfers which did not involve the loss or theft of an access device, such as the Zelle Quickpay transactions in the instant action, the OCC Handbook specifies that the consumer will have no liability for unauthorized transfers reported "[w]ithin sixty calendar days after transmittal of the periodic statement on which the unauthorized transfer first appears." *Ibid* p. 22

142.    For transactions involving an access device, such as a bank card, the OCC explained that "institutions cannot assume that they have satisfied their duty to investigate simply by concluding that the customer's debit card and PIN were used in the transaction at issue. Rather, institutions must take steps to investigate whether there are indications that unauthorized use occurred." *Ibid* pp. 24-25

143.    The OCC Handbook makes recommendations of steps a financial institution can take to ensure compliance with the Regulation E error resolution procedures, including:

- Documentation or written, signed statements provided by the customer.

- Historical information on the customer's pattern of use (e.g., time, frequency, location, and types and amounts of transactions).

- Location of the transaction in relation to the customer's residence, place of business, or normal shopping locations.

- Problems reported by other customers regarding the access device or ATM.

- Signature information on POS [point-of-sale] transactions.

- Police reports, if available.

- Film from security cameras, if available.

***Account User Agreement***

144.    Upon information and belief, the deposit account agreement that applied to Mr. Badiane's Chase checking and account states, in accordance with the EFTA and Reg.E, "If you tell us within two business days after you learn of the loss or theft of your card or code, that the consumer can lose no more than $50 if someone uses the consumer's card without the consumer's permission."

**FIRST CLAIM FOR RELIEF**
**(Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*)**

145.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

146.    This claim arises under the Electronic Fund Transfer Act (EFTA) and Regulation E because it relates to fraudulent and unauthorized electronic fund transfers.

147.    Defendant violated the EFTA and Regulation E. Defendant's violations include, but are not limited to the following:

a. Failing to limit Plaintiff's liability for the fraudulent and unauthorized electronic fund transfers in accordance with the EFTA and Regulation E;

b. Failing to conduct a good-faith investigation of Plaintiff's claims of error or fraud claim;

    c.   Failing to conduct the investigation and arrive at a determination within the time frame provided by the EFTA and Regulation E;

    d.   Failing to give Plaintiff full access to his funds during the investigation;

    e.   Failing to provide Plaintiff with an explanation for Defendant's findings within three business days of the conclusion of its investigation; and

    f.   Failing to provide Plaintiff with copies of documentation that Defendant relied on to reach its determination that there was no error or fraud, after Plaintiff requested the same.

148.    These actions are in violation of 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§1005.6 and 1005.11.

149.    As a result of Defendant's violations of the EFTA and Regulation E, Defendant is liable to Plaintiff for statutory and actual damages, the costs of the action, and reasonable attorney's fees. 15 U.S.C. § 1693m.

150.    Because Defendant lacked a reasonable basis for denying Plaintiff's fraud claim, Plaintiff is also entitled to recover treble damages under §1693f(e).

### SECOND CLAIM FOR RELIEF
(General Business Law §349)

151.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

152.    New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ." N.Y. Gen. Bus. Law §349(a).

153.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual

damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law §349(h).

154.     Defendant violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of its business. Defendant's violations include, but are not limited to, making false representations that:

a.  Defendant had performed a good-faith investigation of his fraud claim, when in fact Defendant did not do so; and

b.  Defendant's stating the transactions in question were in fact authorized and not fraudulent, when Defendant's own records indicate numerous and obvious signs of fraudulent activity, and Defendant identified some or all of the transactions as suspect.

155.     Defendant's conduct has a broad impact on consumers at large and is directed toward consumers at large.

156.     Upon information and belief, Defendant has a pattern and practice of representing to consumers that Defendant has conducted a good-faith investigation of their fraud claims, when in fact Defendant has not, and of refusing to limit consumers' liability for fraud.

157.     Defendant's deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

158.     Defendant's deceptive consumer-oriented acts cause injury and harm to the public interest.

159.     As a result of Defendant's violations of § 349 of the New York General Business Law, Plaintiff has sustained actual damages in an amount to be proved at trial and is also entitled to punitive damages, injunctive relief, costs and attorney's fees.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

160.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

161.     As result of Defendant's failure to credit back the fraudulent and unauthorized transactions to Plaintiff's account, Defendant has been unjustly enriched as a result of its unlawful conduct.

162.     Defendant should be compelled to return all proceeds it received as a result of the unlawful acts described in this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

163.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

164.     Upon information and belief, Defendant entered with Plaintiff into a standard deposit account agreement that governed the terms of Plaintiff's bank accounts.

165.     Upon information and belief, the deposit account agreement provided that consumers will not be held liable for unauthorized electronic fund transfers.

166.     Upon information and belief, Defendant breached this contract by holding Plaintiff liable for fraudulent transfers and withdrawals on his account made by an identity thief.

167.     As a result of Defendant's unlawful actions, Plaintiff incurred damages in an amount to be determined at trial, amounting to at least $1500.00 in financial losses, plus such other damages as may be determined by the Court.

## FIFTH CLAIM OF RELIEF
### Breach of the Duty of Good Faith and Fair Dealing

168.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

169.     Section 1-203 of New York State's Uniform Commercial Code imposes an obligation of good faith in the performance of any contract.

170.     Section 4-103 of New York State's Uniform Commercial Code states that no bank may disclaim responsibility for its own lack of good faith or failure to exercise ordinary care in the performance of its obligations.

171.     Further, under New York law, a covenant of good faith and fair dealing in the course of performance is implied in every contract.

172.     Defendant breached this duty and acted in bad faith by holding Plaintiff liable for fraudulent and unauthorized withdrawals and deposits from and to his account.

173.     Defendant further breached this duty by making an adverse report involving the fraudulent transactions to a credit reporting agency.

174.     Upon information and belief, Defendant made the report in retaliation for Plaintiff's making good faith complaints to government agencies, including the CFPB and the OCC, for Defendant's failure to comply with the EFTA.

175.     As a result of Defendant's breach of the duty of good faith and fair dealing, Plaintiff is entitled to damages in an amount to be determined at trial.

**JURY DEMAND**

176.     Plaintiff demands a trial by jury.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter judgment for Plaintiff on all causes of action;

2. Enter an injunction requiring Defendant to comply with the Electronic Fund Transfer Act and Regulation E, and to train its employees accordingly;

3. Enter an injunction requiring Defendant to cease and desist from pursuing, or to correct, negative action against Plaintiff, including its negative reporting to consumer reporting agencies, as a result of its own failures to comply with the Electronic Fund Transfer Act, Regulation E, and its own deposit account agreement;

4. Award actual, statutory, consequential, and punitive damages to Plaintiff;

5. Award reasonable attorney's fees and costs to Plaintiff; and,

6. Award such other and further relief as may be just, equitable, and proper.

Dated:  March 6, 2020

Respectfully Submitted,

_Mary P. McCune_
MARY P. McCUNE, of Counsel (MM3298)
MANHATTAN LEGAL SERVICES, INC.
*Attorneys for Plaintiff*
1 W. 125th St., 2nd Fl.
New York, NY 10027
(646) 442-3143
mmccune@lsnyc.org